# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2014

## STATE OF TENNESSEE v. ALLEN CRAFT and CEDRIC MIMS

**Appeal from the Criminal Court for Shelby County**
**No. 12-02286     Paula Skahan, Judge**

---

**No. W2013-01822-CCA-R3-CD  - Filed October 10, 2014**

---

Defendants Allen Craft and Cedric Mims were convicted of first degree felony murder, especially aggravated robbery, attempted voluntary manslaughter, and employing a firearm during the commission of a dangerous felony. The trial court sentenced each defendant to life for the felony murder conviction, with concurrent sentences of twenty years for the especially aggravated robbery conviction and two years for the attempted voluntary manslaughter conviction. The trial court also dismissed the charges of employing a firearm during the commission of a dangerous felony. On appeal, the defendants challenge the sufficiency of the evidence and the trial court's refusal to grant a mistrial. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN, J., joined. JEFFREY S. BIVINS, J., Not Participating.

Vicki M. Carriker, Memphis, Tennessee, for the appellant, Allen Craft.
R. Todd Mosely (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Cedric Mims.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ray Lepone and Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Tekela Phillips Rayford testified that her family owned Phillips Sundry, a grocery

store on Vance Avenue in Memphis, and that her cousin, Ronald Ellington, worked at the store as a cook. Rayford requested that Ellington keep her company and protect her while she was at the store alone. On December 3, 2011, Rayford received a phone call informing her that Ellington had been shot and killed and that two other people also had been shot at the store.

Officer Trey Norris of the Memphis Police Department responded to the shooting at Phillips Sundry. He was informed that three victims had been shot, and two of them were lying on the ground beside a white SUV when Officer Norris arrived. A blood trail led officers to the third victim's residence, an apartment complex several streets away. The officers learned that the third victim had returned to the scene, and all three victims had been transported to the hospital.

James Hendricks, the victim in the attempted voluntary manslaughter judgment, testified that he grew up near the scene of the shooting. At 1:00 p.m. on December 3, 2011, Hendricks rode his bicycle to Phillips Sundry, where he saw his friends, Herman Robinson and Ronald Ellington, sitting in Robinson's white Dodge Durango in front of the store. He noticed two young men standing on the corner, one who appeared to be 5'7" to 5'9" tall and about 17 or 18 years old, and both were wearing gray hoodies, purple bandannas, and blue jeans. The young man with the darker complexion had his hands in the pocket of his hoodie as he walked around to the driver's side of Robinson's vehicle. Hendricks reached for his pistol, and the young man suddenly opened fire on Hendricks with what appeared to be a .40 caliber pistol. Hendricks was shot twice and fell, and a friend picked him up and took him to his mother's house one block away. As he was leaving, Hendricks heard two or three more gunshots. When Hendricks arrived at his mother's house, she took his gun and told him to go back to the scene, where he told police what had happened.

Herman Robinson, the victim in the especially aggravated robbery judgment, testified that, on December 3, 2011, he went to Phillips Sundry and parked his truck in the driveway. He was joined there by his "best friend," Ronald Ellington. Subsequently, two young men wearing bandannas approached his truck, pointed guns, and demanded money. Robinson told them he did not have any money. The "dark guy" then opened the door, pulled Ellington out of the vehicle, and took him to the back of the truck. The "little short guy" kept his gun pointed at Robinson and pulled him out of the vehicle. The shorter man kept demanding money, so Robinson emptied his pockets and gave him $46 while the man kept his large pistol pointed at Robinson. Robinson said he heard one gunshot, turned around to see Ellington fall to the ground, and then heard another gunshot. Realizing he had been shot in the leg, Robinson fell to the ground. He identified Defendant Mims as the man who shot him.

Keith Austin, Ronald Ellington's cousin, testified that on December 3, 2011, he was driving down Fourth Street when he saw the defendants crossing the street on the side of Phillips Sundry. They told him that Ellington had been shot. At the scene, Austin saw that Robinson had been shot in the leg and Ellington in the chest. He saw the defendants standing on the sidewalk and asked what they had just done. One "reached down like he had something," so Austin drove off in fear that he had a gun.

Afterwards, Austin and his cousin, Larry Perry, got in Austin's other car and started looking for the defendants. When they found Defendant Mims talking to a woman at a bus stop, Austin displayed a gun and told Mims to get in the car. Mims told him that he did not shoot anyone but admitted that he participated in the robbery. They attempted to take Mims back to the police on the scene, but Mims escaped. As he struggled to escape, Mims' pants, containing a garbage bag and $40, came off, all of which Austin gave to the police.

Romedarrious Humphrey testified that he knew both defendants from the neighborhood and that, on the day of the shooting, he saw the defendants with Melvin Bridgewater. Defendant Mims told Humphrey, "[M]an, we fixing to go rob and lay these folks down in front of the store." One of the defendants was wearing a gray jacket and the other a black jacket. The defendants left and when they returned, their faces were covered with bandannas and they proceeded to walk to Phillips Sundry, where they approached Robinson's truck. Humphrey saw Defendant Craft run to the driver's side, pull the driver out of the truck, and shoot him in the leg. Defendant Mims opened the passenger side door and shot the passenger in the chest. Humphrey heard about five gunshots and waited to run to the victims until the defendants had fled the scene.

Prior to the shooting, Humphrey had hidden his .40 caliber pistol underneath a bag of leaves because the police were conducting searches in the neighborhood, and he later discovered that the gun was missing. He asked Defendant Craft about the gun, and Craft replied, "[Y]eah, I got it." Humphrey testified that Defendant Mims belonged to the Kitchen Crips gang and that Defendant Craft belonged to the Grape Street Crips gang.

Sergeant Joe Stark testified that Defendant Mims told him that he was a member of the Goon Squad gang and that Bridgewater wanted to initiate him into the Kitchen Crips gang. Mims said that Bridgewater told him that because he had been taking care of Mims, Mims had to do something in exchange and threatened to kill him if he did not do so. Bridgewater then told Mims that he wanted him to rob someone who owed him money.

On December 3, 2011, Bridgewater took Mims and Craft for a ride to find the man he wanted them to rob. He pointed out a man who was walking two dogs, saying that the man had received a $1500 check and should have cash in his pocket. Bridgewater then took

the defendants to another neighborhood, where he got out of the car, returned carrying a black bag, and handed a nine-millimeter pistol to Mims and a .40 caliber pistol to Craft. Mims said that Bridgewater put bleach on the bullets before putting them back in Craft's gun and told Mims that his gun was not loaded.

Bridgewater and the defendants then started looking for the intended victim again and found his vehicle parked in front of Phillips Sundry. Bridgewater directed the defendants to approach the vehicle from different directions. Mims said he was scared and did not want to do it, but Craft put a bullet in his chamber and told him, "[M]an, I got your back." They walked up to the passenger side of the car and "put a gun" on the passenger. Craft walked around to the driver's side, opened the door, and pulled the driver out of the truck. Mims was "patting the driver down to see if he had anything" when the passenger suddenly tried to escape. He said Defendant Craft caught the passenger and then he heard gunshots. The driver grabbed Mims' wrist, causing his gun to discharge.

Defendant Mims then ran across the street to where Bridgewater had been watching from the gate. Bridgewater told him to go to his "baby mama's house," which Mims did. When Bridgewater arrived at the house, he gave them new clothes and made them wash their hands with bleach.

Defendant Mims told Sergeant Stark that Defendant Craft had stolen $50 and that Bridgewater had given him $40. Mims was later talking to his girlfriend when Perry suddenly pulled up, got out of the car with a gun pointed at him, and told him to get in the car. Another man then hit Mims in the back of his head and put him in the car. They wanted to know where Craft was and threatened to kill Mims if he did not tell them. While they were driving around, Mims jumped out of the car window and ran away, losing his pants in the process.

Defendant Mims said that Defendant Craft was responsible for shooting Ellington. Mims admitted that, during the robbery, he wore a gray jacket, black hat, black bandanna, black gloves, black jeans, and black shoes and that Craft wore a black hoodie, purple bandanna, blue jeans, and white Air Force Ones shoes.

Defendant Mims said he heard Defendant Craft fire thirteen to fourteen gunshots and saw him shoot the man, with whom he had been fighting, in the chest and stomach area. Mims said that he was scared of Bridgewater because he had threatened to kill him if he did not commit the robbery.

Sergeant Israel Taylor testified that he and Sergeant Robert Scoggins interviewed Defendant Craft on December 7, 2011. Craft said that Bridgewater made him commit the

robbery and that Mims shot Ellington. When they first saw the victim, Bridgewater handed Craft a pistol and threatened to shoot him if he did not go get the money from the victim. Then, as they approached the truck, Mims walked to the driver's side, opened the door, and asked the driver where the money was. The driver started wrestling with Mims over his gun. Mims shot the driver and then the passenger, who had run ran over to the driver's side to help the driver.

Defendant Craft said that he was wearing a tan and black hoodie, blue jeans, and Air Force Ones shoes during the robbery and that his face was covered with a black rag. He recalled that Defendant Mims was wearing a gray jacket, a black hat, and a purple rag wrapped around his face.

Defendant Mims testified that he was fifteen years old when he joined the Goon Squad gang, of which Bridgewater was the leader until he joined the Kitchen Crips gang. Bridgewater was also known as "Melbo the Beast" because he was a "dangerous guy to be around." He started taking care of Mims by providing him with shelter, clothes, and food. Mims explained that Bridgewater took care of many young men because they would do anything he asked in exchange for his protection.

Bridgewater told Mims that Ellington owed him money and that he needed Mims and Craft to get the money for him. When Mims told him that he did not want to rob Ellington, he told Mims that he did not have a choice and that if he did not do so, Bridgewater was going to "take care of [him]," meaning he was going to shoot him. Mims knew he was capable of doing so because Bridgewater had previously shot two other people.

Defendant Mims said that, on December 3, 2011, Bridgewater came to the house where Mims was staying and told him to get into his car, threatening to kill him if he did not comply. Bridgewater handed him a nine-millimeter pistol while he wiped down another gun with bleach. He told the defendants that Ellington had been paid $1500 and that he owed him money. As the defendants approached the victim's vehicle, Bridgewater was watching them as he carried a .357 Magnum pistol in his hand. Bridgewater threatened to kill Mims if he did not rob Ellington. Mims opened the driver's side door and asked where the money was. The driver said he did not have any money, and Mims told him, "I ain't playing." The driver then gave Mims $40. Mims looked up and saw a man pointing a gun at him, telling him to drop his gun. The driver then reached for Mims's arm, and Mims fired a shot. Mims said that "everything went out of control and we were wrestling and tussling." Mims then fled the scene.

Dr. Miguel Laboy, who performed the autopsy on Ellington, testified that he had a gunshot wound to the right side of his chest, which exited his back left side. The cause of

death was a gunshot wound to the chest.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, both defendants argue that the State presented insufficient evidence at trial to sustain their convictions for first degree felony murder, especially aggravated robbery, and attempted voluntary manslaughter because they acted under duress.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Biggs, 211 S.W.3d 744, 747-48 (Tenn. Crim. App. 2006). See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon" where the victim suffers "serious bodily injury." Tenn. Code Ann. § 39-13-403(a). Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Furthermore, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense":

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).

The proof against both defendants was abundant. Herman Robinson, the victim in the especially aggravated robbery judgment, testified how the defendants acted in concert, the "dark guy" taking Ellington from the vehicle to the rear and shooting him in the chest. Robinson identified Defendant Mims as the man who forced him from the truck and shot him in the leg. Later, Keith Austin and his cousin found Defendant Mims on the street. He denied shooting anyone but admitted participating in the robbery. He escaped when they tried to take him into custody. Romedarrious Humphrey, who was acquainted with both defendants, testified that he witnessed Defendant Craft force the driver from the truck and shoot him in the leg, as Defendant Mims pulled the passenger from the truck and shot him in the chest. In his statement, Defendant Mims admitted being at the crime scene and "patting" down the driver to check for money when the driver grabbed at Mims, causing his pistol to discharge. He said that Defendant Craft caught the passenger as he tried to escape, and Mims then heard gunshots. Further, he said that Craft had gotten $50, apparently from the passenger. By contrast, Craft said that it was Mims who had shot both the driver and the passenger.

-7-

From this proof, we conclude that a reasonable jury could have determined that the defendants, intending to act in concert and rob the victims, encountered unanticipated resistance and reacted by killing one victim, wounding the other two, and taking a sum of money.  Accordingly, the proof supports each of the judgments.

In considering the defendants' assertion of duress as a defense to their convictions, we apply the following statute:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

> (b) This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

Tenn. Code Ann. § 39-11-504.  If admissible evidence supporting a duress defense is introduced, the State must negate the defense beyond a reasonable doubt before the defendant may be convicted.  Id. § 39-11-201(a)(3).

We have set out the defendants' statements to police officers that they were afraid of physical harm from Melvin Bridgewater, a gang member, if they did not commit the robbery which he had ordered.  We note that their statements were self-serving and that they did not show they could not have withdrawn in safety or that the harm with which they were threatened clearly outweighed the harm to be prevented by the laws regarding robberies and violence to other persons.

At trial, the jury was instructed on the definition of duress and told that if evidence was introduced supporting the defense of duress, the State had the burden to rebut the defense beyond a reasonable doubt and that any reasonable doubt on the issue of whether the defendants acted under duress required the defendants to be found not guilty.  The jury is presumed to follow its instructions.  State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006).  The jury's guilty verdicts indicate that it found that the State rebutted the defendants' duress defense beyond a reasonable doubt, and the record was sufficient for a reasonable jury to

-8-

make this determination.

## II. Denial of Motions for Mistrial

The defendants contend that the trial court erred in denying their motions for mistrials based upon Keith Austin's testimony that the witness, Larry Perry, was unavailable because he had been shot the night before.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Middlebrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Upon the defendants' motion for mistrial, the defendants argued that the implication from the State's question to Austin about Perry's whereabouts and his subsequent answer was that the defendants were retaliating and responsible for the shooting of the witness. However, the trial court concluded that a mistrial was not warranted because there was no evidence offered as proof to merit the conclusion that the defendants engaged in retaliation. We agree.

We conclude that even if Keith Austin's response to the State's question regarding Larry Perry's whereabouts was improper, any error was harmless beyond a reasonable doubt and did not create a "manifest necessity" for a mistrial. As an initial matter, the defense did not raise an objection to the State's question prior to the witness's answer and therefore allowed the jury to hear the testimony. The record does not reflect that the prosecutor deliberately elicited the testimony in order to create an inference of guilt. Rather, as the trial court found, the testimony was relevant to explain to the jury the reason for the key witness's absence. In addition, the trial court gave a curative instruction to the jury, which we must presume was followed. See Young, 196 S.W.3d at 111.

## CONCLUSION

Based on the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE